All right, looks like counsel are ready, so let's call our last case this morning, 21-3152 Arnold v. City of Olathe. Mr. Gavin. Good morning, or afternoon maybe now. May it please the court. My name is Ryan Gavin and I am here on behalf of Mark Arnold, the appellant and the underlying plaintiff in the matter of Arnold v. City of Olathe and the other defendants. We are seeking reversal of the district court grant of summary judgment in favor of the defendants on the grounds of qualified immunity. This is a case where Sierra Howard, the decedent, was in a home and she was wanted on two felony warrants. And after a period of time, the officers went into the home, cornered her in a laundry room, and when she raised a gun, they shot and fired her. This court, it is clearly established law in this circuit that when an officer or officers aggressively confront an armed and suicidal or emotionally disturbed individual in a threatening manner, that that's a constitutional violation. And that was set forth in Allen v. Muskogee several years ago. And it has been reaffirmed in other cases since that time. And so the court has two factors to look at in evaluating the case with respect to excessive use of force. Those are whether or not there was a constitutional violation and whether or not the law was clearly established. I will begin with the latter of those two factors, that the right here was clearly established. The standard under the applicable authority is best stated as whether there was fair warning to the defendants at the time of the incident that their conduct was unconstitutional. We have the tension between the different rulings. We have the admonition from the Supreme Court not to define the conduct at too high a level of generality. We also have Hope v. Peltzer, which says that it's not a scavenger hunt, that there can be novel circumstances where there will be a finding that it was clearly established. And we have this court statement in, I believe it was Chance, I'm sorry, Casey v. City of Federal Heights, that said you shouldn't find that there is qualified immunity with every new fact pattern. So in this particular case, if we compare the incident that the court ruled on to Allen, it's on all fours, really on every point except for the amount of time it took. Isn't the amount of time critical? Because the case law that you rely on that talks about whether recklessness of the officers somehow created the need for deadly force, all say it has to be immediately related to the deadly force. So, I mean, we have to break it out, don't we? I mean, there's a difference in time between when they arrived at the property, when they entered the house, and when they entered the laundry room. And I would suggest that those don't all fall within immediacy. So, I think I have two responses to that. Number one is that the standard is immediately connected, as set forth in the other cases. I don't know that, and it says that immediately connected means, I believe the only meaning we have in that, the interpretation we have is not interrupted by attenuated intervening time or events. Well, we also discuss actual time, don't we? The cases that I am relying on do have a very short period of time relative to this one. I agree with that. Well, Allen's 90 seconds, for example? Yes. And that's very different, isn't it? It is very different in terms of time. And I think even the district court conceded that with respect to immediately connected, certainly the entry into the laundry room would be immediately connected. And then we have the issue you're bringing up here is how far back can we look from that? Number one is that I would advocate that immediately connected is as much a causation standard that it's not a pure focus on time. And we look at what happened that directly escalated this encounter. The entry into the laundry room escalated the encounter. The entry into the home and the advancement through the home with the dog and with guns drawn escalated the encounter, directly escalated the encounter. One could argue, this is where we might have difference of opinion, would be even using the civilian Mr. Sumner as a negotiator may be distant in time, but it did tend to escalate the encounter because it brought out anger and suicidal comments from Sierra. So I would say that from one perspective, it is not just the time. And if we look only at the time when comparing this case to the others, we fall into the trap of saying that there is qualified immunity every time we have a novel fact pattern, which I think is not how we want to handle the case. The other thing that kind of struck me in one of the earlier arguments was Judge Hartz's comments about the rational basis and the development of scientific data. And as an analogy here, this may go more to recklessness than the immediate connection. But if it was wrong for them to immediately go in after Sierra when she's armed and emotionally unstable, they had a couple hours to gather more information, more data, so to speak, to assess the situation. And that all really confirmed the reasons that it was not a good idea two hours ago to go in there. They were concerned early in their arrival on the scene that it was unsafe and likely to create a lethal encounter if they entered the home with Sierra when they knew she had access to a gun, they knew she was looking for it, and they knew that she was suicidal and that she was emotionally unstable. Let me interrupt for a minute. One of the facts in the record is that an officer, before they went into the house, saw her and reported that her hands were empty. And that's when they entered the house. And the owner of the house had said that he had moved the gun from where it usually is under the mattress and hid it in the closet. So I don't think that it's clear that they knew she was armed until they actually opened that closet door, and then you hear them saying, gun, gun, as if they're surprised. Is that a fair reading of the record in your view? I would disagree that they were surprised that she had a gun. Certainly their mindset was that we should assume that she has a gun, that she had access to it, she had been looking for it where it was last hidden, that Officer Parks, who was out in the yard with Sergeant Sweeney, one of the defendants, did lay eyes on a gun and did tell Sergeant Sweeney, that's a gun, and pulled him behind a tree. So there were eyes laid on the gun. And there were officers who said, once she said she had a gun, and once she said she was suicidal, that you treat this as the very dangerous situation where you don't go in and try to apprehend her at close range. For how long? They had two warrants for her arrest. How long were they required to hang out at her property before executing those warrants? I don't know that I would define it as how long. I mean, you certainly don't have to wait them out forever, but there was evidence in the record that there was nothing about the character of the encounter that changed prior to that that made entry necessary. And I believe that Mr. Iams, I-J-A-M-E-S, the expert for the Johnson County defendants, testified that negotiations were going as well as they had been, the conversations were going as well as they had been, right before Sergeant Sweeney decided he wasn't going to stay there and talk to her anymore. So I'm not advocating that it's a never-ending amount of time, but in the absence of a reason, at least at that point, when they know she's agitated, they know she's potentially armed, if not know that she's actually armed, that it's basically guaranteeing a lethal encounter, or they should have recognized that they're basically guaranteeing a lethal encounter if they go into the home. The Supreme Court cases talk about the totality of the circumstances and evaluating the use of lethal force, Graham versus Connor, of course, and in the Tenth Circuit, maybe a few other places, we now have this immediately connected conduct. I'm not quite sure where that came from. How does immediately connected differ from the totality of the circumstances? Because it seems to me there's plenty of facts that can proceed without any immediacy that would be relevant to the objective use of lethal force in a particular encounter. Yes, and I agree with that, and I think that's part of the reason why maybe I struggle with or disagree with the concept that immediately connected is a purely time issue. In the context of a case where you consider the totality of the circumstances. Yeah, I know that's your response to Judge McHugh, and I know the city differs on that point, but the fact that there was a gun somewhere in the house was pretty relevant to the approach that they might use once they're in the house, for better or for worse, mental health, addiction, there's a lot of things that occur before the guns are drawn that's relevant. Correct. I agree with that. But if you have a question, I may be missing it, so I'm just making sure I'm responding. You're doing fine. Isn't this case a lot like Myers versus Oklahoma County from the Tenth Circuit? I don't think it's possible to say that it's a lot like Myers. Myers at the time was a case that did not have body camera or audio footage, to my recollection, and when you review Myers, there's basically one paragraph, maybe two paragraphs, describing what happened prior to entry. I know in the more recent cases we often have a blow-by-blow, minute-by-minute, or hour-by-hour accounting of what happened. So if you have a fact-intensive analysis that has to be done in this case, you can't take the one paragraph of facts in Myers and use that to decide Myers. I would also add that in Myers, the suspect fired the gun, which did not happen here, and may have raised the stakes for making entry. In addition, in Myers, there's a description of hours of non-confrontational communication. And that is the description. We don't know, for example, how that compared to the use of Mr. Sumner in this case, who made terrible comments that escalated the situation, how that differs from Myers, because we don't have that background in Myers. So I would say in a factual-intensive inquiry, you can't just say Myers requires a finding consistent with Myers in this case. I would like to reserve some rebuttal time. Yes, Your Honor. If they hadn't gone into the laundry room and she had shot and killed herself, wouldn't the argument be they should have gone in because she was obviously in distress and might have had a gun? That could have been an argument, but at least at that point in time, they did not change the nature of the encounter. I think what makes this one different from that circumstance is, it was the officers who instigated the escalation that led to a use of lethal force. If she had just done that on her own at a random time without anybody having an opportunity to predict or prevent it, that would be a different case. At what point did the officers unconstitutionally escalate? I would say they definitely unconstitutionally escalated when they entered the laundry room. Be a little more precise. Why was that reckless? That was reckless because they had every reason to believe that she was armed. She was emotionally unstable. At that point, if you're going to corner her and she has a gun, you have to assume that she's going to raise that gun and there's only one response to that, which is to shoot back. It's not like some of the other cases where I think Bond, there was a hammer, or someone else had a crowbar, where maybe if you corner that person from a distance, they can't hurt you. But you corner somebody with a gun, even with distance, you don't have safety. And so with that, I think it was more reckless. Let me ask you one question about Myers. You seem to distinguish that on the ground that we can't say from Myers that what happened here was okay. But the question is whether what our discussion in Myers makes it clear that the law wasn't clearly established in favor of the plaintiff in this case. Isn't that the standard we should look at? We should apply? I don't think Myers does that because I would say that Allen makes it clear in this case that the law is clearly established. Okay. Well, Allen is our 92nd case, right? Yes. I'll let you reserve your time. But Allen, the rule that came out of Allen was that you don't aggressively corner or confront an armed and suicidal subject in an enclosed space, in a threatening manner. Thank you, counsel. Your time has expired. I think we're going to hear first from Mr. Holder. Thank you. May it please the court, Andrew Holder, on behalf of the City of Olathe, Kansas, Sergeant Tim Sweeney, and Officers Jameson, Miller, and Ian Mills. I would indicate that Mr. Ridgway and I have agreed that I'm going to take the first ten minutes and then I'm going to try to leave him an extra five minutes. This is a case where the material facts are not in dispute. This is not a rapid, short-lived encounter between the police and Sierra Howard. Officers arrived at a residence that was not Sierra Howard's in response to a complaint that she was there and that the homeowner did not want her there anymore, and with the knowledge that she'd recently been issued two felony warrants. The entire purpose of the encounter and the officer's presence at the residence was to arrest Sierra Howard. The officers arrived at 2.48 p.m., and they stayed outside and attempted to get Ms. Howard out of the house for almost two hours. At about 4.12 p.m., the officers enlisted the homeowner, Mr. Sumners, who was Ms. Howard's boyfriend, to see if they could get him to assist them with communicating with her, opening the lines of communication, and seeing if he could ultimately persuade her to surrender. The officers didn't actually enter the house until 5.40 p.m., almost three hours after they'd arrived. From there, it was a short 33-foot distance from the front door, which was already open, in which the officers had permission to enter from the homeowner to the back laundry room where Ms. Howard was already by the time that they entered. It took them 16 minutes from the time they entered until ultimately they entered the laundry room. So again, this is not a short-lived encounter, and this is not a rapid rush to bring Ms. Howard into custody. The officers were methodical. They took a substantial amount of time. With respect to... How do you respond to the argument that they knew that she had a gun at that point, and as a result, entering there would almost certainly require the officers to use deadly force? I think there are two important pieces of evidence with respect to that issue. Number one, the evidence is that a non-defendant officer, looking at Sierra Howard through the window, saw what he perceived to be a gun and said, At the time that he made that proclamation, Sergeant Sweeney and Major Lane Fier were discussing the plan for what they were going to do next. So there is no evidence in the record that Sergeant Sweeney heard Officer Park say, or that any of the other defendants ever heard a positive affirmation that somebody had really seen the gun. What we do know in addition to that is, separate and apart from that proclamation, at 536, the officers form the stack at the front of the house. The door is open. It's only at 540, at the precise moment that one of the officers who can see Sierra Howard in the back room, says that her hands are empty, that the officers then enter the house. So at the exact moment that they entered the house, what they knew was her hands are empty. Whether they assumed that there was a possibility she had a gun in the laundry room or somewhere else, it's entirely possible. But in terms of the, do we know Sierra Howard has a gun in her hands? At the time they entered, they knew that her hands were empty. From there, they advanced to the living room. They got a second confirmation that her hands were empty. They then advanced to the kitchen and got a third confirmation that her hands were empty. Where was she at the time? She's in the laundry room with the door. In the window that the officers could see. Yes, and so they're radioing and that's what's causing the officers to move forward. So from the kitchen, what happens is initially at the time they entered and until they're in the kitchen, the door is closed to the laundry room. So they can't actually see Sierra. They're relying on the officers who can see her from the window. But when they get in the kitchen, the door gets cracked open. And from there, the testimony in the record is that the officers could see Sierra. They could see her face. They could see her hair. And when they could see her hands, they could see they were empty. When she was standing on the other side of the door, they could see her hands were empty? The ones outside could see? No. The ones inside could see that her hands were empty. At the time, she cracked the door open because then she started talking to the dog, and that's when all of that goes. So then she's having a face-to-face conversation with the officers when she's barking at the dog and looking at them. And so the testimony is when she cracked the door open and we could see her, we could see her head and her hair, and at times we could see her hands, and when we could see her hands, they were empty. Okay. I watched the video. I couldn't remember that part. Sure. Yeah, I don't remember seeing her hands on the video. Well, and the video is from Deputy Parks. The specific testimony, or I'm sorry, Deputy Peterson. The specific testimony I'm referring to comes from Officer Miller at Olathe, and this is cited in our brief. But, you know, obviously he's in a different physical location than Deputy Peterson is, and he doesn't have a body cam, so we can't see from the video what Deputy Peter or what Officer Miller could see. But could you hear him say on the video we have, her hands are empty? At the time that they moved from the kitchen to the laundry room, no, nobody proclaims again, we can see her hands and they're empty. I'm sorry, which officer saw her hands empty when she was at the door to the laundry room? When the door opened, it was Officer Miller. But there's no evidence that he communicated that to the others? No, but they're all standing in the same general vicinity with one another. Okay. So in terms of the decision making from there, Sergeant Sweeney at the front of the stack is communicating with Howard. They're going back and forth about who they are, where she's going to go, what's going to happen, and that kind of thing. And so all in the back room near the laundry room. And so at that point, that's when she slams the door, which again would be difficult to do if she's got a gun in her hands, not impossible, but perhaps more difficult to do. She slams the door and says, I'm just going to call the real police. Fuck it, closes the door. At that point, that's when Sergeant Sweeney immediately acts. And that's where we touch on recklessness because it's the distinction between saying, I know if I go in that laundry room, the likely result is going to be a firefight. And saying, I need to go in that laundry room because I'm worried about what happens if nobody intervenes. So his mindset is not, I'm doing this knowing that something bad is going to happen. His mindset is, I'm doing this to prevent her from taking arms and having something bad happen. And I think that's a critical distinction in terms of recklessness. I do want to touch while I've still got a couple minutes left on the clearly established problems because I think that there are a couple important parts to take note of. Number one, the bond decision that first came out of the Tenth Circuit and then came from the Supreme Court, that was a decision that was decided in 2016. The shooting in this case happened in 2017. I don't think there's really any material disagreement that between 2016 and the shooting in this case, there were no new developments in the law that we need to talk about. So bond is highly relevant in the sense that the cases that bond says could establish clearly established precedent are the same. And so when we look at the Supreme Court and what they've said there, they've said it's Allen and it's only Allen. So in terms of what we're talking about with clearly established law, it's Allen or it's nothing. And I think that it's highly relevant what the Supreme Court actually says when they're comparing the circumstances in bond with the circumstances in Allen. So the Supreme Court characterizes Allen as officers responding to a potential suicide call by sprinting towards a parked car, screaming at the suspect, and attempting to wrest a gun from his hands. Conversely, they describe bond as officers engaging in a conversation with the suspect, following him into a parked garage or into a garage at a distance of six to ten feet and not yelling at him until after he picks up the weapon. And with respect to the comparison of those two fact patterns, the Supreme Court tells us that the bond fact pattern is not close enough to have put those officers on notice that Allen made their conduct unconstitutional. And if you look at a decision that came out of the Tenth Circuit, that's an unpublished decision from roughly two weeks ago, it's Lennon versus City of Casper. What it talks about is the interpretation of the Supreme Court's reading in bond is saying that for Allen to apply, you need factual symmetry. And I think we've already heard from appellant's counsel here that we all agree there's no factual symmetry in there. There's a huge and material distinction between a multiple hours long encounter and there's four or five cases, all of which are decided where the encounter lasts most of the time and only a minute. I think there's one unpublished decision, Hastings, that involves four minutes. But that's a key fact because to the extent we're talking about conduct that precedes the actual use of force, what Allen says is that it's got to be immediate. We also heard, I think, and Judge Teeter touches on this in her decision, there's not a lot of clear guidance about what immediately connected means. That in and of itself is a big red flag in terms of whether there's clearly established case law that could have put these officers on notice that they needed to consider conduct preceding the use of force. I would also add that to the extent that there's a disagreement about whether time is a factor in there, the alternate explanation for what the court said in Allen is that you can consider conduct in the moments preceding the use of force. So I think that's pretty defining in terms of what we're really supposed to be looking at and how far back we're supposed to go. I'm happy to continue to address questions. I do not want to eat up any more of Mr. Ridgway's time if there are none, however. All right, let's hear it for Mr. Ridgway. Thank you, Your Honors. I'm defending Deputy Clint Peterson and Sergeant Taryn Chalk of the Sheriff's Office in this one. Judge Teeter got it right. Qualified immunity is a safe harbor. It protects all but the knowingly incompetent and those who intentionally violate the law or purposely violate the law. And it's just not this case. It's just not these facts. A couple of things I want to point out. I'm concerned about the knowledge and the comments that I've heard earlier with respect to whether she knew she had the gun or not. Officers are on the stack on the front door. And Officer Hennessy, the police department, is calling the shots from the back corner because he can kind of see the laundry room where she's at. There were two comments at that time. He said, first one, windows fully open. She's talking. She's got her hands empty. Cigarettes only. Then Sergeant Sweeney says, hey, come out. That's after they had entered the house? No, sir. This was on the stoop. Pardon? Okay. This is on the stoop. The stack is on the stoop. Sergeant Sweeney says, basically, come on out. Come on out, Sierra. And then Sergeant, I'm sorry, Hennessy says again, and I quote, her hands are empty. If you guys choose to move forward, to take her. And that is volume three, page 820, I'm sorry, 874. That's Deputy Peterson's body camera. There are two separate comments. They're saying, hey, she didn't have the gun at that point. And that's again before they entered the house, right? Yes, ma'am. They're still on the porch. Correct. There are two comments there. And then when they start working their way into the house, so they're working their way back, they get to the kitchen. They kind of stop there and they're talking with her there. There are two comments at that time, two separate comments. Again, I'm almost certain they're Hennessy. This is based on what I hear and kind of what I think is his voice. Her hands are still empty, eyes on. And then a few seconds later, he says, her hands are empty, her hands are in the air, she's got her face in the window. That's four comments. And then they start moving from that kitchen. It's not really even a hallway. It's just the kitchen and you've got the back bedroom and you've got the laundry room there. It's a very short period of time. She's got the door cracked open talking to him. That's so close there. And this is a tiny house. It's a very tiny house. They've got the door cracked open. And I think she's sitting there next to the door. She's kneeling next to the door. And she's not hanging the gun out the door frame saying, get back. She's not saying, I'm going to shoot you. She's sitting there talking to him. Where am I going? How many people are down there? What's Bond? Your dog's cute, all this stuff. They can see there, and they can see that she didn't have the gun. If they did, it's going to be a different game. I think that's very important. Is there anything in the record that says they could see she didn't have the gun? Were there any comments? At that point in time, you have the last two comments, I believe, are from Officer Hennessy with the police when they're in the kitchen. And they start to edge forward. However, if you look at Peterson's body camera, as they start going down, he's kind of the third in the stack. He's after the shield and the lethal cover and the dog. But you can get a good depiction of what these officers saw as they're going down. The door's open, and she's right there. And she doesn't have it. She doesn't have it at that point in time. There was a quick comment about so many officers, so little time. Deputy Parks, I'm sorry, Sergeant Parks, that's Officer Parks Olitha, and he did make a comment to Sergeant Sweeney about he saw the gun or he thought that she had the gun in her hands. But the uncontroverted evidence also says that Sweeney was talking to Major Lanphier at the time about tactics, and he wasn't paying attention. He didn't hear it. So Parker said that when? Officer Parks says that a while ago when they're still outside and they're talking tactics and trying to figure out what to do. Correct, correct, much earlier. I guess my point is the uncontroverted testimony there is that Sweeney said, I didn't hear that, I'm talking to Lanphier about what we're going to do here, how we're going to fix this. And that's uncontroverted evidence, so we can't challenge the truthfulness and the credibility of that on the summary judgment stage. Long story short, I think I'm out of time, but I think the ruling of the district court got to be upheld on both prongs for all the officers. Thank you, counsel. Thank you. Let's see, do we have any rebuttal time left? All right, we appreciate the arguments. Those were helpful, at least to me. Counselor, excused. The case is submitted. And the court is in recess, I think, until 1 o'clock today or so. Judge McHugh, for your benefit, it is 1154 Mountain. I think we can reconvene by Zoom at 1210. Can I be in your office? Okay. Thank you. Thank you. Thank you.